**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**DANIEL R. LONERGAN,**

     **Plaintiff,**

**vs.**                            **Case No. 4:14cv42-MW/CAS**

**DEPARTMENT OF CORRECTIONS
SECRETARY JULIE JONES,**

     **Defendant.**

_____/

**<u>REPORT AND RECOMMENDATION</u>**

After the Eleventh Circuit Court of Appeals affirmed in part and reversed in part the order dismissing the pro se Plaintiff's amended complaint, ECF No. 13, the case was remanded for further proceedings. ECF Nos. 35-36.  The only claim that remains is Plaintiff's ADA claim as presented in Count 1, ECF No. 35 at 11, but Plaintiff was permitted to supplement his amended complaint.  *See* ECF Nos. 40, 43, and 60-61. Thereafter, service was directed on Julie Jones, Secretary of the Florida Department of Corrections, *see* ECF No. 48, who filed an answer, ECF No. 51, and the parties were provided a discovery period, ECF No. 55.

Mr. Lonergan filed a motion for summary judgment, ECF No. 64, as did Secretary Jones, ECF No. 66.  Secretary Jones has filed a response to Mr. Lonergan's motion, ECF No. 70, and Mr. Lonergan filed a response to the Secretary's motion, ECF No. 75.  The motions are ready for a ruling.

## I.   Legal standards governing a motion for summary judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Thus, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp., 477 U.S. at 323, 106 S. Ct. at 2553.  The non-moving party must

then show[1] the court "that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S. Ct. at 2554.

An issue of fact is "material" if it could affect the outcome of the case. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259 (11th Cir. 2004) (citations omitted). A party must show more than the existence of a "metaphysical doubt" regarding the material facts, Matsushita Elec. Indus. Co., LTD. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986), and a "scintilla" of evidence is insufficient. The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Hickson Corp., 357 F.3d at 1260 (quoting Anderson v. Liberty Lobby, 477 U.S. 242, 252, 106 S. Ct. 2505, 2505, 91 L. Ed. 2d 202 (1986)). All reasonable inferences must be resolved in the light most favorable to the nonmoving party,

---

[1] "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Owen v. Wille, 117 F.3d 1235, 1236 (11th Cir. 1997), *cert. denied* 522 U.S. 1126 (1998) (quoting Celotex, 477 U.S. at 324, 106 S. Ct. at 2553) (quoting Fed. R. Civ. P. 56(c), (e))). The nonmoving party need not produce evidence in a form that would be admissible as Rule 56(e) permits opposition to a summary judgment motion by any of the kinds of evidentiary materials listed in Rule 56(c). Owen, 117 F.3d at 1236; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553.

Watkins v. Ford Motor Co., 190 F.3d 1213, 1216 (11th Cir. 1999), "only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (quoted in Ricci v. DeStefano, 557 U.S. 557, 586, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co., 475 U.S. at 587 (internal quotation marks omitted) (quoted in Ricci, 557 U.S. at 586, 129 S. Ct. at 2677).

"Cross motions for summary judgment do not change the standard." Latin Am. Music Co. v. Archdiocese of San Juan of the Roman Catholic & Apostolic Church, 499 F.3d 32, 38 (1st Cir. 2007) (quoted in Ernie Haire Ford, Inc. v. Universal Underwriters Ins. Co., 541 F. Supp. 2d 1295, 1297 (M.D. Fla. 2008).  "'Cross motions for summary judgment are to be treated separately; the denial of one does not require the grant of another.'" Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n, 483 F.3d 1025, 1030 (10th Cir. 2007) (quoting Buell Cabinet Co. v. Sudduth, 608 F.2d 431, 433 (10th Cir. 1979)) (quoted in Ernie Haire Ford, Inc., 541 F. Supp. 2d at 1297-98)).  Because Plaintiff (as the party with the burden of proof) has a heavier burden on summary judgment, the Court will consider

the Defendant's motion first.  If Defendant's motion is denied, the Court will consider whether Plaintiff is entitled to judgment as a matter of law.

## II.    Relevant Rule 56 Evidence[2]

Mr. Lonergan is incarcerated in the Florida Department of Corrections and is serving a parole eligible life sentence.  ECF No. 64 at 3; ECF No. 75, Ex. 2 (ECF No. 75-1 at 10).[3]  Mr. Lonergan has been in the Department's custody since 1982.  *Id.*  When his motion for summary judgment was filed in July of 2016, he was 52 years of age.  *Id.*

In 2010, two "suspicious" skin lesions were noted on Mr. Lonergan and he was given a referral to a dermatologist for assessment.  Ex. A at 2 (ECF No. 66-1);[4] Ex. C at 53-64, 87-90 (ECF No. 66-3); Ex. 3 (ECF No. 64-6).  Mr. Lonergan was diagnosed with Actinic Karatoses ("AK") and

---

[2] Only evidence relevant to the surviving ADA claim has been considered.

[3] Mr. Lonergan submitted two affidavits.  The first was with his own motion for summary judgment and the second was in response to Defendant's summary judgment motion.  The second motion is unsigned and not dated.  It has, nevertheless, been considered as evidence without objection.  It is presumed that Mr. Lonergan would correct that oversight if given the opportunity under Rule 56(3).

[4] Defendant's exhibits are referenced by an alphabetical name and are filed with document 66.  Plaintiff's exhibits are referenced by numerical name and are filed with document 64 unless otherwise noted.  Plaintiff's additional exhibits which were filed with his response in opposition to summary judgment, ECF No. 75, are so identified.

cryotherapy[5] was directed.  Ex. A at 2 (ECF No. 66-1); Ex. C at 87-88 (ECF

No. 66-3); Ex. 3 (ECF No. 64-6).[6]  "Actinic karatoses, also called solar

keratoses, are scaly, crusty growths or lesions caused by damage from the

sun's ultraviolet rays."  Ex. A at ¶5 (ECF No. 66-1).  "There is some

evidence that with prolonged neglect and continued solar exposure, these

lesions harbor the potential for progressing to a squamous cell carcinoma,

but the risk is small and can be virtually eliminated with regular use of

appropriate measures, such as" sunscreen, a hat, protective clothing, and

reduced sun exposure.  *Id.*  "Due to the potential to develop into cancer, AK

is often referred to as precancer, but AK itself is not cancerous."  *Id.*  "AK is

very common, especially among those with fair skin and eyes," older

individuals, and those with a history of "smoking, multiple drug use and

alcoholism."  *Id.*

---

[5] Cryotherapy is the most common treatment for actinic keratosis and uses liquid nitrogen to remove skin lesions by freezing them.  See www.mayoclinic.org/diseases-conditions/actinic-keratosis.

[6] The medical records show Mr. Lonergan was seen by Dr. Suarez on October 11, 2010, at the South Florida Reception Center.  Ex. C at 57, 89-90 (ECF No. 66-3). Dr. Suarez first diagnosed Mr. Lonergan with AK in the bilateral shoulder and recommended cryotherapy to remove both lesions.  *Id.*  When Mr. Lonergan was seen by dermatology again on December 13, 2010, he was diagnosed with AK on the left arm.  Ex. C at 53-54, 87-88 (ECF No. 66-3).

Mr. Lonergan was a smoker for 20 years, although he stopped

smoking, and has a history of "polydrug abuse" and alcoholism.  *Id.* at ¶6;

ECF No. 75, Ex. 2 (ECF No. 75-1 at 10).  Mr. Lonergan has "a AA and NA

sobriety date of" May 22, 2009.  ECF No. 75, Ex. 2 (ECF No. 75-1 at 10).

Mr. Lonergan's "father passed from cancer as well as his father and mother

as well." *Id.*

Mr. Lonergan declares in his affidavit that on October 11, 2010, a

dermatologist examined him at the South Florida Reception Center for

suspicious lesions on his bicep and shoulders.  Ex. 4 at 2 (ECF No. 64-5).

Mr. Lonergan says the doctor told him to "stay out of the sun" and wrote a

"no sun pass so that [he] could follow his advice." *Id.*  Mr. Lonergan

explains that he believes the dermatologist's instruction means "to

minimize sun exposure at every opportunity."  ECF No. 75, Ex. 2 (ECF No.

75-1 at 10).

However, the declaration submitted by Mr. Maier in support of

Secretary Jones' motion for summary judgment states that the

"dermatologist recommended a sun pass, straw hat, and sunscreen during

a follow-up appointment in December 2010."  Ex. A at ¶7 (ECF No. 66-1).

"The recommendation simply says 'sun pass' and does not specifically

recommend no sun exposure whatsoever, nor does it recommend transfer to a different facility." *Id.*; *see also* Ex. C at 88 (ECF No. 66-3) and Ex. F at 11 (ECF No. 66-6).  Mr. Maier further declares that "[t]here is no evidence in the medical record that [Mr.] Lonergan has squamous cell carcinoma or any other type of cancer."  Ex. A at ¶7 (ECF No. 66-1).

The initial recommendation for "sun pass" and "straw hat" was in December 2010.  Ex. C at 88 (ECF No. 66-3 at 88).  The medical record indicates on January 4, 2011, Mr. Lonergan filed an informal grievance complaining that he had not received the "no sun pass."  *Id.* at 52.  The record reflects the grievance was "approved" and the pass would be issued.  *Id.*  On January 5, 2011, the record indicates a "no working in sun" pass was written, to be effective from January 7, 2011, through January 5, 2012.  *Id.*  On January 21, 2011, a notation in the medical record reveals the pass was "rewritten" as a "no prolonged exposure to sun pass."  *Id.* at 52.  That entry indicates the pass was previously a "no working in the sun pass."  *Id.*  Another notation for January 24, 2011, indicates Mr. Lonergan was given a "no prolonged sun pass," good for January 21, 2011, through January 21, 2012.  *Id.*

Mr. Lonergan reports that after returning to Hendry Correctional Institution, the "doctor there changed the pass to no working in the sun." Ex. 4 at 2 (ECF No. 64-5).  Mr. Lonergan advises that the pass was subsequently changed again to state "no more than 15 minutes of sun exposure."  *Id.*

The medical record reveals that following his transfer to Desoto Annex in late March 2011, he continued to have the passes which were noted to be "valid."  Ex. C at 28-30.  He had been "given a straw hat/no prolonged sun exposure pass from 1/21/11 to 1/21/12 and a prescription for sun-screen lotion."  Ex. 3 at 8 (ECF No. 64-4).  Those passes were renewed in January 2012.  *Id.* at 9.

Contrary to the medical records, Mr. Lonergan declares that after he was transferred to Desoto Correctional Institution, his pass for no more than 15 minutes of sun was "determined invalid and useless."  Ex. 4 at 3, ¶4 (ECF No. 64-5).[7]  He states that it became "apparent that [he], as well as others were expected to stand in lines outside for periods of time often exceeding 30 minutes."  *Id.*  Nevertheless, Mr. Lonergan said he "went to

---

[7] The record reveals that Mr. Lonergan was transferred to Desoto Annex on March 30, 2011, and was there until August 26, 2014.  Ex. D at 3 (ECF No. 66-4 at 3).

medical and was provided a pass for the laundry to manufacture [him] long sleeve shirts and a straw hat." *Id.* at ¶5.  He was also provided sun block SPF-15.  *Id.*  He states that his request that the doctor refer him to the dermatologist again was denied.  *Id.*  Nevertheless, Ms. Blankenship examined him on several occasions and "measured the lesions and noted the same over the course of several months."  *Id. Id.* at ¶6; *see* ECF No. 66-3 at 19-20.

Mr. Lonergan states that when new lesions began "to appear and the old lesions were returning, [he] began to try to avoid the outside at every opportunity."  Ex. 4 at 3, ¶7 (ECF No. 64-5).  He reports not going to the recreation yard and avoiding "meals and particular services and programs such as chapel, etc., as [he] became greatly concerned by the appearance of the lesions."  *Id.*  Although he continued to "attend almost every AA meeting," that too "ceased when [he] noticed a new lesion."  *Id.*

Mr. Lonergan states that he restricts his "outside movement as much as possible" and avoids recreation "if lines are long and it is bright outside." ECF No. 75, Ex. 2 (ECF No. 75-1 at 11).  He declares that he forfeits activities and programs "in favor of [his] condition."  *Id.*  He reports that he "cannot use the sun block as [he has] severe reactions to it."  *Id.*  He

sometimes misses "meals as a result of unwanted sun exposure."  *Id.* at 12.

Mr. Lonergan also presented sworn declarations of several inmates who confirm that on numerous occasions, Mr. Lonergan was asked to go to the recreation yard to jog or play basketball, but he always refused.  Ex. 7 (ECF No. 64-8).  The declarations state that Mr. Lonergan indicated he was "concerned about his cancerous skin condition and wanted to follow the dermatologist's advice."  *Id.* at 2-3.  Another declaration by James Davis also stated that Mr. Lonergan did not participate in AA because he was concerned about sun exposure.  Ex. 8 at 3 (ECF No. 64-9).  Other declarations stated that Mr. Lonergan also declined to attend chapel services because "he was trying to stay out of as much sun as he" could, Ex. 8 at 2, 4 (ECF No. 64-9), and was not "going to go to chow" because of concerns about the sun.  Ex. 9 at 2 (ECF No. 64-10).

In July 2011, Mr. Lonergan submitted a request for accommodation with the Department of Corrections.  Ex. 1 (ECF No. 64-2 at 2); Ex. F at 9 (ECF No. 66-6).  He described his disability as "actinic keratoses keratoses [sic]/squamous cell carcinoma/UV photosensitivity."  *Id.*  He requested that

he be transferred "to a self contained facility; i.e., South Bay, Graceville, Blackwater." *Id.*

Mr. Lonergan's request was denied on September 29, 2011, by Martie Taylor, ADA Coordinator.  Ex. 1 at 4 (ECF No. 64-2 at 2); Ex. F at 15 (ECF No. 66-6).  Mr. Lonergan was advised that his medical classification did not indicate he was "disabled."  *Id.*  Ms. Taylor also advised that the medical department "did not recommend a transfer, just that [he] be given a sun pass and a straw hat," which had been done.  *Id.*  She further told Mr. Lonergan that he could "contact the recreation officer and ask" for exercises that he could do in his dormitory or cell."  *Id.*  Mr. Lonergan's grievances challenging that denial were also denied.  *Id.* at 5-12; *see also* Ex. 4 at 4 (ECF No. 64-5).

Mr. Lonergan states in his declaration that he sought the reasonable accommodation noted above so he "could still exercise and attend services, activities and programs."  Ex. 4 at 3 (ECF No. 64-5).  He advises that South Bay Correctional Facility has two large recreation yards with a "large general steel type covering over [the] basketball court and other recreational activity area" as well as "awning covered walkways connecting the buildings together."  Ex. 5 at 4-5 (ECF No. 64-6).  Mr. Lonergan states

that he "was never offered an accommodation in the form of transfer to a self contained facility."  Ex. 4 at 4 (ECF No. 64-5).  He states that "FDOC policy provides expressly for this form of accommodation, but [he] was excluded for some reason."  *Id.*

Mr. Lonergan further declares that the "long sleeve prison made shirts" have "no UV protection."  ECF No. 75, Ex. 2 (ECF No. 75-1 at 11).  Additionally, the "straw hat" and shirt have not prevented the return of skin lesions and the development of other lesions.  *Id.;* see also Ex. 4 at 5 (ECF No. 64-5); *see also* Ex. 11 at 2, 4-6 (ECF No. 64-12).  Mr. Lonergan has identified numerous "new lesions" which are on his body.  ECF No. 75, Ex. 2 (ECF No. 75-1 at 13).  Other inmates also report that although they wear protective clothing and have had lesions removed, the condition returns.  ECF No. 75, Ex. 1 (ECF No. 75-1 at 6-8).  Mr. Lonergan submitted a copy of the Merck Manual of Medical information which advises that in twenty-five percent of people diagnosed with basal cell carcinoma, "another basal cell carcinoma develops within 5 years."  Ex. 12 at 3 (ECF No. 64-13).  Thus, annual skin examinations are recommended along with "staying out of the sun and using protective clothing and sunscreen."  *Id.*

Mr. Lonergan further declares that he does "not go to the recreation yard" and does "not participate in many services and activities such as AA, chapel, etc." Ex. 4 at 4 (ECF No. 64-5). Mr. Lonergan says that he has "tried to jog in long pants and long sleeves and a straw hat, [but] it results in heat exhaustion and chaffing of [his] skin." *Id.* at 5. He says that he "would like to participate in services, programs and activities of the Department including recreation, but [his] concern for further lesions prevails." *Id.*

Mr. Lonergan also presented sworn declarations of several inmates who advise they had been diagnosed with a form of skin cancer and been provided with long sleeve shirts, straw hats, and sun block. Ex. 11 (ECF No. 64-12). Inmate Jamie Harper states that he also does not attend many services, programs, or activities which require sun exposure, including going to the recreation yard. *Id.* at 2; *see also* ECF No. 75, Ex. 1 (ECF No. 75-1 at 4). He says that he "was told to stay out of the sun and to avoid the sun at every opportunity." *Id.* Inmate Dennis Ross states that he was recently provided a biopsy on a possible skin cancer on his scalp. *Id.* at 3; ECF No. 75, Ex. 1 (ECF No. 75-1). He was also "told to stay out of the sun." *Id.* Three other inmates provided affidavits stating they were also

diagnosed with AK and provided with sun block and long sleeve shirts.  *Id.*
at 4, 6; ECF No. 75, Ex. 1 (ECF No. 75-1).  Inmate Carl King states that he
was also "ordered by the Dermatologist to stay out of the sun," which he
declares to be "impossible."  *Id.* at 5; ECF No. 75, Ex. 1 (ECF No. 75-1 at
7).

Secretary Jones has submitted evidence demonstrating that inmates
may be referred to a specialist such as a dermatologist or optometrist.  Ex.
A at ¶3.  Notwithstanding a recommendation for treatment by the specialist,
"it is up to the inmate's primary care provider to make the final decision
about the appropriate course of treatment."  *Id.*

A medical pass is provided to an inmate when, in the judgment of a
medical provider, an inmate needs "certain relief from departmental or
institutional requirements that affects a special medical problem."  *Id.* at ¶4.
The Chief Health Officer "is responsible for ensuring that any medical pass
is for a documented medical need and is only issued for the length of time
that the need exists."  *Id.*  "A specialty consultant, such as a dermatologist,
does not have the authority to write a medical pass."  *Id.*  Medical passes
"can only be prescribed by a physician of clinical associate, although non-
physician healthcare providers may issue a temporary pass that will not

exceed fourteen days."  *Id.*  Mr. Lonergan was given "a pass for restricted

sun exposure (no more than 15 minutes per hour) and was provided a hat

pass, sunscreen and long sleeves."  Ex. A at ¶8 (ECF No. 66-1).  "A

blanket recommendation to stay out of the sun completely is not medically

necessary for treatment of AK."  *Id.*

The Department of Corrections "requires that each inmate be housed

in a setting that can adequately provide for their healthcare treatment

needs, as well as a setting compatible with any impairment or disability

they may have."  Ex. A at ¶9 (ECF No. 66-1).  Mr. Maier declares that

Mr. Lonergan "is not medically incompatible" with either Desoto

Correctional Institution or Union Correctional Institution.  *Id.*

The Department "utilizes a system of impairment ratings to identify

inmates with physical difficulties, and rates inmates with physical, hearing

and vision impairments, as well as those with developmental disabilities."

Ex. B at ¶3 (ECF No. 66-2).  "Based on the impairment rating, inmates may

require housing at certain facilities designed to accommodate their

impairment, such as a prison designed to accommodate wheelchairs."  *Id.*[8]

---

[8] Mr. Lonergan submitted a copy of the Department's Procedure Number 604.101, concerning the ADA's provisions for inmates.  Ex. 6 (ECF No. 64-7).

"If an inmate makes a request for accommodation, medical information is provided to the ADA Coordinator in order to make the determination whether that particular inmate is a qualified person with a disability under the ADA, and whether a particular accommodation is needed.  *Id.*

The declaration submitted by Evelyn Garst in support of Secretary Jones' summary judgment motion advises that there is nothing in Mr. Lonergan's records which indicate he is "medically unsuitable to be housed at Desoto Correctional Institution or Union Correctional Institution" nor did the dermatologist recommend his transfer.  Ex. B at ¶5 (ECF No. 66-2).  Garst states that the Department tries to accommodate inmates at their current institution so long as they meet the "criteria to be housed there."  *Id.*  Garst indicates that only if "an inmate's impairment cannot be accommodated at his current facility, he would be deemed medically unsuitable and the staff at the institution would work on finding a more appropriate place for the inmate."  *Id.*

Mr. Lonergan was transferred to Union Correctional Institution on August 29, 2014.  Ex. D at 3 (ECF No. 66-4).  Since then, the medical records do not reveal he has sought medical care for his AK condition, although he has been to medical for other issues.  Ex. C at 1-11 (ECF No.

66-3).  In his deposition which was taken on June 28, 2016, Mr. Lonergan

said that he stays away from the medical department because he was

given a false disciplinary report for filing a grievance against medical.  Ex.

E (ECF No. 66-5 at 17-19[9] (ECF No. 66-5 at 4-6).  Mr. Lonergan also

testified that his medical passes "have all expired" but he still is able to

wear long sleeves and his hat.  *Id.* at 19 (ECF No. 66-5 at 6).  He said that

he does not "wear the sunscreen because [he is] allergic to it."  *Id.*

Mr. Maier's declaration states that Mr. Lonergan has been refusing to

access medical at Union Correctional Institution due to a state fear of

retaliation.  Ex. A at ¶10 (ECF No. 66-1).  Mr. Maier advises that "[b]eing

seen by medical is the only way for [Mr.] Lonergan's current condition to be

evaluated and for appropriate passes or prescriptions to be written for his

continued care."  *Id.*  Mr. Maier suggests that Mr. Lonergan's refusals to

seek medical care is "an effort to orchestrate a transfer to a desired private

prison location."  *Id.*  He further states that Mr. Lonergan has "an

---

[9] The pages referenced are the page numbers printed on the deposition
transcript.  In parenthesis, the page in CMECF is given for easy reference.  Both
numbers are provided, however, because Mr. Lonergan does not have access to the
Court's electronic docket (CMECF).

established pattern of using and manipulating prison health services for a variety of secondary gains."  *Id.* at ¶6 (ECF No. 66-1).

Finally, Mr. Lonergan submitted Procedure Number 604.101 which governs "Americans with Disabilities Act Provisions for Inmates."  ECF No. 75, Ex. 4 (ECF No. 75-2).  The Procedure's purpose is to "establish guidelines in accordance with the Americans with Disabilities Act of 1990" and "provide equal access to the Department's programs, services, and activities to inmates who have documented disabilities which affect major life activities."  ECF No. 75-2 at 3.  Under that Procedure, the Department of Corrections acknowledges as a "physical impairment" any "physiological disorder or condition, cosmetic disfigurement" which affects the "skin or endocrine" body system.  *Id.* at 6.  The Procedure directs that "CHCC [Comprehensive Health Care Contractor] staff will determine if an inmate is disabled by his/her record of impairment or some other qualified (e.g., medical or psychological) evaluation of the inmate's impairment."  *Id.*  It is the Department's policy not to "discriminate on the basis of disability in the provision of services, programs, and activities and will take reasonable steps to ensure that the rights of qualified inmates with disabilities are addressed in a manner consistent with legitimate correctional interests."

*Id.* at 7.  Department "staff and the inmate share responsibility to verify an

inmate's disability to determine placement in an appropriate institution."  *Id.*

The Procedure requires "[e]very effort" be made "to provide appropriate

accommodation . . . to ensure the inmate's safety."  *Id.*

　　　As it pertains to inmate placement, the Procedure directs that

inmates are not housed "solely on the basis of a disability or impairment."

ECF No. 75-2 at 16.  "Inmates shall be recommended for placement at a

facility through routine classification assignment."  *Id.*  "The inmates must

be compatible with the requested facility's mission and profile" and staff

must "screen to appropriately classify and transfer the inmate to a facility

that has been designated to accept inmates with that type of impairment(s)

or disability(ies)."  *Id.*  "The assignment of inmates to facilities will be in a

manner which will best enable the Department to maintain security and

order."  *Id.*  "An inmates will be assigned to a facility that can provide

appropriate security and supervision, that can meet the health needs of the

inmates as identified by the Department's health services staff and, to the

extent possible, can meet the inmate's need for programs."  *Id.*  "The

Department will maintain a list of facilities that are designated to house or

care for inmates with qualified disabilities or impairments."  *Id.*  A "qualified

inmate with a documented disability" is permitted to request

accommodations under Title II of the ADA if he "is unable to participate in,

or benefit by, the programs, services, or activities of the Department . . . ."

*Id.*  When an inmate with an undocumented disability submits a request for

accommodation, the "Chief Health Officer/Institutional Medical Director or

her/his designee will verify the inmate's disability."  *Id.* at 17.  A request for

accommodation may be "denied when it would pose a risk to the safety or

security of the institution, staff or the public, or when the request would

adversely impact other penological interests, including deterring crime and

maintaining inmate discipline."  *Id.* at 19.

## III.  Analysis

Title II of the ADA prohibits public entities from discriminating against

a qualified individual with a disability.  42 U.S.C. § 12132.  "State prisons

fall squarely within the statutory definition of "public entity . . . ."

Pennsylvania Dep't of Corr. v. Yeskey, 524 U.S. 206, 210, 118 S. Ct. 1952,

1953, 141 L. Ed. 2d 215 (1998).  Additionally, the statute defines the term

"qualified individual with a disability" as meaning 'anyone with a disability

'who, with or without reasonable modifications to rules, policies, or

practices, the removal of architectural, communication, or transportation

barriers, or the provision of auxiliary aids and services, meets the essential

eligibility requirements for the receipt of services or the participation in

programs or activities provided by a public entity.'" <u>Yeskey</u>, 524 U.S. at

210, 118 S. Ct. at 1955 (quoting 42 U.S.C. § 12131(2)).  Furthermore, the

<u>Yeskey</u> Court noted that "'activities,' medical 'services,' and educational

and vocational 'programs,' all . . . at least theoretically 'benefit' the

prisoners . . . ."  524 U.S. at 210, 118 S. Ct. at 1955.

> To state a claim under Title II, a plaintiff must show:
>
> (1) that he is a qualified individual with a disability; (2) that he
> was either excluded from participation in or denied the benefits
> of a public entity's services, programs, or activities, or was
> otherwise discriminated against by the public entity; and (3) that
> the exclusion, denial of benefit, or discrimination was by reason
> of the plaintiff's disability.

<u>Bircoll v. Miami–Dade Cnty.</u>, 480 F.3d 1072, 1083 (11th Cir. 2007) (citing

<u>Shotz v. Cates</u>, 256 F.3d 1077, 1079 (11th Cir. 2001)) (quoted in <u>Redding</u>

<u>v. Georgia</u>, 557 F. App'x 840, 844 (11th Cir. 2014)).  Thus, "a disabled

prisoner can state a Title II–ADA claim if he is denied participation in an

activity provided in state prison by reason of his disability."  <u>Bircoll</u>, 480

F.3d at 1081 (citing <u>Yeskey</u>, 524 U.S. at 211, 118 S.Ct. at 1955).

**Does Mr. Lonergan have a disability?**

It is undisputed that Mr. Lonergan has been diagnosed with Actinic Keratosis [AK].  Mr. Lonergan points out that the Department's ADA Procedures recognize that a "physical impairment" may include a "physiological disorder or condition" which affects the skin, although medical do not consider him disabled because "FDOC does not consider precancerous lesions as a disability."  *See* ECF No. 64 at 4.   ECF No. 64 at 3-5.  He contends that under those Procedures and the Eleventh Circuit's prior decision in this case, his condition should be recognized as a disability.  *Id.* at 5-6.

Secretary Jones, however, argues that Mr. Lonergan "is not a qualified individual with a disability."  ECF No. 66 at 13.  The Secretary acknowledges that a disorder "affecting the skin falls within the definition of impairment" under the ADA, but contends that Mr. Lonergan's AK is not a sufficient disorder because it is "not cancerous" and does not "substantially limit" a major life activity.  ECF No. 66 at 14-15.  The Secretary argues an "impairment is a disability if it substantially limits a major life activity, meaning it substantially limits the ability of a person to perform a major life activity as compared to most people in the general population."  ECF No.

66 at 14 (citing 29 C.F.C. 1630.2(j)(1)(ii)).  While acknowledging that "[a] major life activity also includes the operation of a major bodily function, including normal cell growth," ECF No. 66 at 14, the Secretary contends that cases which recognize "normal cell growth" as a disability concern people with a cancer diagnosis.  *Id.* at 15.

Here, there is no evidence that Mr. Lonergan has been diagnosed with skin cancer, but he has been diagnosed with actinic karatoses [AK], a precancerous condition.  A "disability" is "a physical or mental impairment that substantially limits one or more major life activities of such individual." Henderson v. Thomas, 891 F. Supp. 2d 1296, 1306 (M.D. Ala. 2012) (citing 42 U.S.C. § 12102(1)).  Additionally, under the ADA Amendments Act of 2008, the definition of "major life activities" was expanded to include the operation of "major bodily functions."  42 U.S.C. § 12102(2)(B) (cited in Norton v. Assisted Living Concepts, Inc., 786 F. Supp. 2d 1173, 1185 (E.D. Tex. 2011)).  The Act's "sample list of major bodily functions that constitute a major life activity" includes "normal cell growth."  Norton, 786 F. Supp. 2d at 1185.  Indeed, it has already been established that "'normal cell growth' is a major life activity" under the ADA.  Lonergan v. Florida Dep't of Corr., 623 F. App'x 990, 993 (11th Cir. 2015) (citing 42 U.S.C. § 12102(2)(B)).

Cancer "substantially limits normal cell growth."  29 C.F.R.

§ 1630.2(j)(3)(iii).  Likewise, a precancerous skin condition which causes

skin lesions may also be considered to also substantially limit "normal cell

growth."  "[A]s long as an impairment substantially limits one major life

activity, such as normal cell growth, it need not limit other major life

activities, such as working, in order to be considered a disability."  42

U.S.C. § 12102(4)(C) (quoted in Norton, 786 F. Supp. 2d at 1185).

Furthermore, "[a]n impairment that is episodic or in remission is a disability

if it would substantially limit a major life activity [such as normal cell growth]

when active."  42 U.S.C. § 12102(4)(D) (quoted in 786 F. Supp. 2d at

1185).

The Secretary's argument is acknowledged that "[a]n impairment is

not necessarily a disability under the statutory definition; the impairment

must substantially limit a major-life activity."  Adams v. Rice, 531 F.3d 936,

943-44 (D.C. Cir. 2008) (distinguishing an impairment and a disability)

(cited in Henderson v. Thomas, 891 F. Supp. 2d 1296, 1306 (M.D. Ala.

2012)).  However, the ADA's revised regulations provide that the "term

'substantially limits' shall be construed broadly in favor of expansive

coverage, to the maximum extent permitted by the terms of the ADA.

'Substantially limits' is not meant to be a demanding standard."  Moore v. Jackson Cty. Bd. of Educ., 979 F. Supp. 2d 1251, 1260 (N.D. Ala. 2013) (quoting 29 C.F.R. § 1630.2(j)).  Indeed, the regulation directs that "the threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis."  Moore, 979 F. Supp. 2d at 1260 (quoting 29 C.F.R. § 1630.2(j)) see also Angell v. Fairmount Fire Prot. Dist., 907 F. Supp. 2d 1242, 1258, n.7 (D. Colo. 2012), aff'd, 550 F. App'x 596 (10th Cir. 2013) (quoting from the Appendix to 29 C.F.R. § 1630.4 which states, "We hope this will be an important signal to both lawyers and courts to spend less time and energy on the minutia of an individual's impairment, and more time and energy on the merits of the case—including whether discrimination occurred because of the disability . . . .") (internal quotation omitted)).

Under the broad construction mandated by Congress, Mr. Lonergan has come forward with evidence to show that AK has substantially limited the major life activity of normal cell growth.  He has shown that he has recurring skin lesions which continue to develop and could possibly evolve into cancer.  Mr. Lonergan points out the risk of developing skin cancer is "higher for those with particular physical characteristics and habits."  ECF

No. 75 at 5.  It is undisputed that he has those characteristics.  *Id.*

Additionally, there is evidence that Mr. Lonergan has missed meals,

foregone daily activities such as recreation, chapel, and AA meetings

because of his medical condition and the need to limit sun exposure.  At a

minimum, Mr. Lonergan has submitted sufficient evidence to create a

genuine dispute of fact as to whether he is disabled under the ADA.  *See*

Wolfe v. Florida Dep't of Corr., No. 5:10-CV-663-OC-PRL, 2012 WL

4052334, at *3 (M.D. Fla. Sept. 14, 2012) (finding prisoner's evidence was

sufficient to "create a triable issue regarding whether" he had a disability

when he submitted evidence that his "daily activities were restricted as a

result of his asthma: (1) Wolfe rarely played sports or exercised and if he

did he usually had to stop due to breathing difficulties; (2) asthma affected

his ability to participate in other activities including singing; and (3) Wolfe

could not work on the lawn squad or kitchen duty because both jobs

worsened his asthma symptoms.").  The Secretary's argument that

Mr. Lonergan is not a qualified individual with a disability under the ADA

should be rejected.

**Has Mr. Lonergan suffered discrimination?**

Accepting that Mr. Lonergan has a disability, he must also show that he was "'excluded from participation in or ... denied the benefits of the services, programs, or activities of a public entity' or otherwise 'discriminated [against] by such entity'; (3) 'by reason of such disability.'" Shotz, 256 F.3d at 1079 (quoted in Hoffman v. Flores, No. 3:10-CV-610-J-37JBT, 2011 WL 3897981, at *9 (M.D. Fla. Sept. 6, 2011); *see also* Flournoy v. Culver, 534 F. App'x 848, 852 (11th Cir. 2013). "Failure to provide a reasonable accommodation—or 'reasonable modification' as the statute puts it—to services, programs, or activities for a disabled inmate may constitute discrimination in violation of Title II." Kramer v. Conway, 962 F. Supp. 2d 1333, 1351 (N.D. Ga. 2013) (citations omitted). "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7) (quoted in Kramer, 962 F. Supp. 2d at 1351–52. "The Supreme Court has defined reasonable accommodation to mean one that provides 'meaningful access' to the

program."  Alexander v. Choate, 469 U.S. 287, 300–01, 105 S.Ct. 712, 83

L.Ed.2d 661 (1985) (cited in Medina v. City of Cape Coral, Fla., 72 F. Supp.

3d 1274, 1278 (M.D. Fla. 2014)).

   "A public entity need not 'make structural changes in existing

facilities where other methods are effective in achieving compliance with

this section.'"  Shotz v. Cates, 256 F.3d 1077, 1080 (11th Cir. 2001)

(quoting 8 C.F.R. § 35.150(b)(1)).  Additionally, "[r]easonable

accommodations that impose an undue burden on the public entity are not

required."  Bircoll, 480 F.3d at 1082-83 (citing Tennessee v. Lane, 541 U.S.

509, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004)) (cited in Kramer, 962 F.

Supp. 2d at 1352).

   In this case, there is a genuine dispute as to whether Mr. Lonergan

has been provided a reasonable accommodation.  The Secretary contends

that providing him with a hat, long sleeve shirt, sun screen, and "medical

pass for reduced sun exposure" is both reasonable and in compliance with

medically accepted recommendations.  ECF No. 66 at 19-21.  Secretary

Jones notes the lack of any evidence showing that a physician

recommended transfer to a facility with less sun exposure.  Id. at 21-23.

On the other hand, Mr. Lonergan has provided evidence that the sun

screen is of no use because he is allergic to it.  He provided evidence that

the long sleeve shirts do not contain UV protection.  In addition, he points

out that those provisions (hat and sun screen) do not prevent his lesions

from returning nor do they prevent the development of new lesions.

Mr. Lonergan has also shown that he has missed meals and forgone other

activities because he would be required to stay outside in the sun for more

than 30 minutes which, notably, would violate his "sun pass."  He has,

therefore, provided evidence in support of the finding that he has been

denied the benefits of certain "services, programs, or activities" of the

Department of Corrections because of his disability.

Secretary Jones argues that Mr. Lonergan has simply made "his own

subjective decision to avoid meals and other activities because he does not

want to stand in the sun . . . ."  ECF No. 66 at 18.  Further, the Secretary

argues that "it is difficult to see" how Mr. Lonergan's life is limited "any

more than millions of other people, who have the same restrictions and

recommendations on skin care and skin cancer prevention in terms of

limited exposure, clothing, and sunscreen use."  *Id.*  The distinction is that

Mr. Lonergan is a prisoner and able to wear only the clothes provided to

him by the Department, use only the sunscreen issued without, apparently,

options to deal with allergies, and to attend chapel services, recreation, and

meals only during the times that those activities are provided.  A free

citizen may choose to go jogging early in the morning or late in the evening

when the sun goes down to avoid sun exposure.  There is nothing in this

record to suggest that Mr. Lonergan has such options.

It is true that Mr. Lonergan does not have a right to be housed in the

institution of his choice.  He does, however, have the right to receive a

reasonable accommodation so that he is not precluded from enjoying the

activities and benefits provided to other prisoners.  Recreation time, for

example, includes a social component which is absent if an inmate is

directed to do exercises in his dormitory or cell.

"The hallmark of a reasonable accommodation is effectiveness."

Wright v. N.Y. State Dep't of Corr., 831 F.3d 64, 72 (2d Cir. 2016) (quoting

Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis., 804 F.3d 178,

189 (2d Cir. 2015).  "Specifically, a reasonable 'accommodation need not

be 'perfect' or the one 'most strongly preferred' by the [ ]plaintiff, but it still

must be 'effective[.]'"  Wright, 831 F.3d at 72 (denying summary judgment

based on disputed facts and quoting <u>Dean</u>, 804 F.3d at 189) (quoting <u>Noll</u>

<u>v. Int'l Bus. Machs. Corp.</u>, 787 F.3d 89, 95 (2d Cir. 2015))).

A jury might consider that providing Mr. Lonergan with a hat, long

sleeve shirt, and sun screen is a reasonable accommodation.  However, it

is also possible that a jury could consider that, in effect, the only

meaningful accommodation provided to Mr. Lonergan was a straw hat

because the sun screen was unusable and the long sleeve shirt lacked UV

protection and so was not effective in protecting him from the sun's

ultraviolet rays.  If so viewed, a jury could conclude that providing

Mr. Lonergan with a straw hat was not a "reasonable accommodation" and

violates Title II of the ADA.  Because resolution of this case involves

resolving genuine issues of material fact, summary judgment should be

denied both parties.

Several additional arguments should also be addressed.  First, the

Secretary argues that no treating physician has recommended

Mr. Lonergan "be moved to a facility with less sun exposure, nor is it

medically necessary."  ECF No. 66 at 21-22.  There is a genuine dispute as

to this issue as well because Plaintiff provided evidence that his

dermatologist directed him to "stay out of the sun" and he was provided a

"no sun pass."   Other prisoners state that they were also directed to stay out of the sun.  Mr. Lonergan says that his pass from the doctor was altered.  Given this dispute, the Court is unable to conclude that Mr. Lonergan's accommodations were in compliance with medical recommendations.

Second, the Secretary contends that the issue in this case is that Mr. Lonergan was not provided the accommodation "that he would have preferred."  ECF No. 66 at 21-23.  That argument should be rejected.  The issue is whether Mr. Lonergan was discriminated against because a reasonable accommodation was not provided so he could have "meaningful access to the benefit" provided to other prisoners.  *See* Alexander, 469 U.S. at 301, 105 S. Ct. at 720.  The Secretary contends that Mr. Lonergan was provided with a reasonable accommodation which, as noted above, is a disputed issue.

Finally, the recommendation herein is based upon the evidence submitted in this case and Mr. Lonergan's specific disability and health issues.  This recommendation is not intended as an "across the board" finding that all prisoners with skin cancer or precancerous lesions must be housed at one particular institution.  Rather, the recommendation is based

upon the broad proposition that prisoners are entitled to enjoy recreational opportunities of the Florida Department of Corrections.  A reasonable accommodation to provide meaningful access to that benefit is required by the ADA, whether the accommodation is through auxiliary aids and services or a transfer to an institution that

## IV.   Recommendation

It is respectfully **RECOMMENDED** that Plaintiff's motion for summary judgment, ECF No. 64, be **DENIED** and Defendant's motion for summary judgment, ECF No. 66, be **DENIED** because there are genuine disputes of material fact.  It is further **RECOMMENDED** that this case be **REMANDED** for further proceedings prior to setting the case for trial.

**IN CHAMBERS** at Tallahassee, Florida, on February 28, 2017.


 S/    Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Within fourteen (14) days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to these proposed findings and recommendations. Fed. R. Civ. P. 72(b)(2).  A copy of the objections shall be served upon all other parties.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Fed. R. Civ. P. 72(b)(2).  <u>Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control.</u>  If a party fails to object to the Magistrate Judge's findings or recommendations as to any particular claim or issue contained in this Report and Recommendation, that party waives the right to challenge on appeal the District Court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.